1  Paul Kingston, appearing in *propria persona*

2  11 Silvercreek Ln, Ballwin, MO 63011

3  Phone: (314)601-4662

4  E-mail: Picasso.dilly@gmail.com

**FILED**

AUG 2 5 2025

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
        DEPUTY CLERK

5

6

7

8                    **UNITED STATES DISTRICT COURT**

9                    **EASTERN DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| 11   ,United States of America | **Case Nos.**  U.S. District - 2:25-cr-00047-DC |
| 12            Plaintiff, | Magistrate – 3:24-po-00182-DMC |
| 13     v. | OMNIBUS REPLY TO OMNIBUS RESPONSE TO POST TRIAL MOTIONS (DOCUMENT 54 IN |
| 14   ,Paul Kingston | DISTRICT CASE ABOVE) |
| 15            Defendant. | Hearing Date: TBD under the Honorable District Judge Dena M Coggins |
| 16 | |
| 17 | |
| 18 | |

19      PLEASE TAKE NOTICE, that on August 22, 2025- I, defendant, Paul Kingston, acting in

20  *propria persona*, submit this reply to the government's omnibus response to various post-trial

21  motions I have (Documents 25, 26, 27, & 46).

22

23                    **I-     SUMMARY OF PROCEEDINGS**

24

25      Before receiving my citations for violation of Forest Closure Order # 05-11-02-24-05

26  (Hereinafter referred to as the "Rainbow Closure" or "Rainbow Closure Order"), I had no

27  significant familiarity or interest in legal precedents or procedures. By the time of my trial, I had

28  learned some- but only enough to know I had barely scratched the surface. One thing I did know

1    was that I only had two weeks to make almost any challenge to my verdict, and that my trial

2    attorney would be very unlikely to do so on my behalf. Despite my limited legal acumen, I had

3    two clearly articulable issues with the proceedings at that time.

4            1)    That neither my attorney nor I were ever given access to documentation that

5                  was required by Forest Service procedures specifically because such orders can

6                  result in criminal charges (see Document 25, p2), and

7            2)    that my attorney had not adequately represented my case (see Document 26)

8            I did my best to express these issues to the court according to my limited understanding of

9    the appropriate rules and procedures, filing a brief including three motions and a notice of appeal

10   (Documents 24-29) Feb. 18, 2025. I also made good faith efforts to improve my understanding of

11   these rules and procedures (compare Documents 25 & 26 with Document 47), to simplify the

12   proceedings (see Documents 35 & 39), and to keep the court informed of my intentions and

13   circumstances (see Documents 24, 34, 37, & 52).

14           On March 3, 2025, I received notice of a hearing on May 16, 2025 (Document 36)

15           On March 24, 2025, five defendants who received citations for violation of the Rainbow

16   Closure Order, through publicly appointed counsel, filed motions to dismiss their charges with

17   prejudice. On April 7, 2025, their charges were dismissed with prejudice (Document 46).

18           Upon reviewing the record of their motions, I assessed that they provided grounds for

19   vacating my conviction and filed a motion stating those grounds on April 25,2025- which allowed

20   time for arguments before the then scheduled hearing on May 16 (Document 46).

21           On May 5, 2025, that hearing was vacated with a motion schedule to be set later, and a

22   hearing schedule was set for the above referenced post-trial motions on June 6, 2025 (Documents

23   51 & 53).

24           On July 31, 2025, the Government filed an "Omnibus Response" to the four currently

25   unresolved post-trial motions (Document 54).

26

27   **II-    NOTE ON GOVERNMENT'S ASSERTED "BACKGROUND"**

28

2 KINGSTON- reply to UNITED STATES OMNIBUS RESPONSE

1      At my trial, part of my testimony was to allege that the Rainbow Closure "was done for

2  political reasons and not done for public health reasons (Document 45, Transcript, P 40 L25 thru

3  P41 L2)." These allegations were acknowledged but not challenged during cross examination,

4  when the A.U.S.A asked, "You think it (the Rainbow Closure Order) was entered for political

5  reasons (Document 45, Transcript, P 51 L17)?" without any further cross examination of my

6  allegations when I answered in the affirmative. The government's only rebuttal in their closing

7  statement was to claim these allegations had already been settled by a pre-trial motion to compel

8  discovery, claiming that rendered them irrelevant to the trial (Document 45, Transcript, P 54, L23

9  thru P 55, L3).

10      In issuing his ruling, the Honorable Magistrate Cota made no mention of these allegations

11  (Document 45, Transcript, P 59 L 13 thru P 61 L 13). As such, the court must read section II-A of

12  the Government's Omnibus response titled "Concerns about fire danger, public health and

13  sanitation prompt issuance of a closure order (Document 54, P2, L5-18)" to be disputed, rather

14  than factual when considering these motions.

15

16                       **III-   ARGUMENTS**

17

18      The United States opposes three of the motions I advanced, "the Discovery Motion, The

19  Ineffective Assistance Motion, and The Motion to Vacate (Document 54 P 1, L 2-3). I shall

20  address those oppositions in the order in which they were presented-

21

22                   **A.  DISCOVERY MOTION**

23

24      It appears that the United States misunderstood my "Motion to reconsider denial of

25  discovery" (Document 25, hereinafter referred to as "Discovery Motion"). The motion was not

26  for reconsideration of the selective enforcement claim advanced by my trial attorney's motion to

27  compel discovery. Rather, it was a motion for the Magistrate to consider that, regardless of that

28  claim of selective enforcement- the specific documents I was seeking discovery of fell under the

1     purview of *Fed R Crim P (16)(a)(1)(E)* which states items within the government's "possession,

2     custody, and control" which are "material to preparing the defense" must be provided to the

3     defendant for inspection upon defendant's request.

4            The documents I was seeking through the Discovery Motion were-

5                   (1) The "Assessment of Need and Enforcement Plan" (hereinafter referred

6                   to as the "ANEP"),

7                   (2) The "Civil Rights Impact Analysis" (hereinafter referred to as the

8                   "CRIA,") and

9                   (3)-The Order Checklist.

10            Each of these items were procedurally required by *U.S.F.S. Handbook 5309.11*

11    (Hereinafter referred to as the "Law Enforcement Handbook"). The Law Enforcement Handbook

12    states the Forest Service is responsible for "providing certified authentic copies of orders and

13    relevant case file documents for court or litigation purposes" (Section 32.21 "Order Case Files")

14    and that "Case File" is required to have an ANEP and a CRIA. Clearly- the Forest Service Chief

15    who promulgated the Law Enforcement Handbook had reason to believe these types of

16    documents would be "material to preparing the defense" per *Fed R Crim P 16(a)(1)(E)*.

17            In *United States v. Marshall, 132 F.3d 63, 67 (D.C.Cir.1998)*, the D.C. Circuit Court

18    states-

19                   "The rule as written does not compel the conclusion that inculpatory

20                   evidence is immune from disclosure. Inculpatory evidence, after all, is just as

21                   likely to assist in "the preparation of the defendant's defense" as exculpatory

22                   evidence. In other words, it is just as important to the preparation of a defense to

23                   know its potential pitfalls as it is to know its strengths"

24            As I stated in my Discovery Motion (p2), an ANEP- potentially could have shown there

25    was insufficient planning to ensure the general public received proper notice of the Rainbow

26    Closure Order. Additionally, had my attorney been able to examine a CRIA associated with the

27    closure- inadequacies could have been used to challenge the Rainbow Closure. But even if such

28    documents showed all the appropriate and adequate measures were indeed taken- viewing that

1    documentation would be crucial to "preparing a strategy to confront the damaging evidence at
2    trial; by conducting an investigation to attempt to discredit that evidence; or by not presenting a
3    defense which is undercut by such evidence." *Marshall*

4        *United States v Cedano-Arellano,332 F.3d 568 (9th Cir. 2003)* illustrates my position. In
5    that case-

6                "Juan Pablo Cedano-Arellano was indicted on charges of smuggling
7            cocaine into the United States after a search at the Mexican border revealed
8            packages of cocaine in the gas tank of his truck. Cedano-Arellano entered a
9            conditional guilty plea, preserving his right to appeal the following issues: whether
10           the district court erroneously denied him discovery on the narcotics detector dog
11           that "alerted" on his gas tank, (and unrelated issues)" *Ibid.*

12   Before the appeal-

13               "The dog's handler testified at a pretrial evidentiary hearing on March 18,
14           2002. The judge reviewed *in camera* the training logs maintained by the dog's
15           handler, and concluded that none of the information was *Brady* material or
16           contradictory to the witness's testimony" *Ibid.*

17       While the Ninth Circuit ultimately upheld the conviction, they also found that "the district
18   court judge erred in denying defense counsel's motion for discovery of the dog's training and
19   certification records under *Fed. R. Crim. P. 16*" *Ibid.*, deciding that in light of the dog's

20       In the same way that the Court found "Discovery of the qualifications of a dog used for
21   drug detection is mandatory," as the ninth circuit found in *Cedano-Arellano*, discovery of items in
22   the "Order Case Files" related to closure order I am charged with violating is mandatory.

23       But, unlike *Cedano-Arellano*, where the fact that the Judge from the lower court had
24   reviewed the dog's training documents *in camera* and issued the finding of fact that "the dog was
25   a 'reliable trained narcotics detector dog'."- later cases involving the Rainbow Closure revealed
26   that these items were never actually created, and two defendants had their charges dismissed with
27   prejudice after filing motions which included grounds based on the failure of the Forest Service to

5 KINGSTON- reply to UNITED STATES OMNIBUS RESPONSE

1 | create these items (Document 46, P 7, L20-25[1]).

2 | The fact that the Federal Defender was able to learn that the Forest Service never created

3 | these materials serves to further reinforce that they are discoverable. The fact that this information

4 | was part of two successful motions for dismissal clearly indicates that the error was not harmless.

5 | As such, the court must grant a new hearing and fresh discovery if it does not overturn my

6 | conviction outright.

7 |

8 | **B. INEFFECTIVE ASSISTANCE MOTION**

9 |

10 | I withdraw my "Ineffective Assistance Motion."

11 | While it does have merits, I believe the unorthodox argument it puts forward makes it

12 | difficult to compel the Court to grant relief, and more likely to be appealed, should it prevail.

13 | As I stated earlier, I began my post-trial process with extremely limited legal knowledge

14 | and understanding. This limited understanding left me unable to properly articulate or present an

15 | argument based on the standard in *Strickland*, and with awareness of my own inadequacy- I

16 | elected to present the motion on record.

17 | At this point, while my legal understanding is still quite limited, I believe it has progressed

18 | to a point where I am now capable of putting forward a motion according to the standards of

19 | *Strickland*. As this motion would inevitably include evidence my counsel received that was not

20 | put on the record- I believe it is inappropriate to attempt to address it in my appellate brief.

21 | So, if it pleases the Court, I request the setting of a schedule for such a motion in the event

22 | that it would still be relevant after the disposition of the matters currently before it. I will be able

23 | to prepare and file such a motion within two weeks of receiving notice of a schedule.

24 |

25 | **C. MOTION TO VACATE**

26 |

27 | _____

28 | see also *Zirk, case no 3:24-po-00167-DMC, Document 15 & Oswald, case no 3:24-po-00137, Document 17*

1    There are two primary grounds to my Motion to Vacate, the first being that the record

2    from my case as well as the cases of similarly situated defendants showed the Rainbow Closure to

3    be unlawful and the second being that the government suppressed information relevant to my

4    defense by failing to inform my attorney that specific, procedurally required documentation for

5    the Rainbow Closure had never been created by the Plumas Forest Service.

6        I shall address the government responses one at a time-

7

8        **(1) While conceding that the Forest Service likely complied with 36 CFR**

9            **261.50(a) when promulgating the Rainbow Closure- I maintain that the**

10           **evidence presented by the government is insufficient to prove it was**

11           **promulgated in compliance with 36 CFR 261.50(b).**

12

13   The declarations and exhibits the government refers us to in their opposition provide

14   evidence of Forest Service compliance with *36 CFR 261.51(a)* requiring that copies of the

15   Rainbow Closure to be posted at the appropriate Forest Service Offices *United States v.*

16   *Mordchia, Case No. 3:24-po-00186-DMC,* (Documents 20–27). And while it remains suspicious

17   that the government was unable to present similar evidence at the hearing of *Oswald, Et al.*[2], I

18   will not dispute that such copies were posted.

19       But the evidence presented by the government in *Mordchia* does not establish compliance

20   with *36 CFR 261.50(b)*, requiring that all Forest Orders be posted by- "Displaying each

21   prohibition imposed by an order in such locations and manner as to reasonably bring the

22   prohibition to the attention of the public."

23       Exhibit 4 presented by the government in *Mordchia* (Document 26, p 2) is a map of

24   postings showing that the nearest one to the Rainbow Gathering is at the very edge of its

25   "footprint.[3]" This is a location far from the majority of the area alleged to be occupied by the

26   Gathering and as the testimony at my trial demonstrated, the nearest posting was a mile away

27   ---

[2] See case no 3:24-po-00137-DMC, Doc 22; case no 3:24- po-00147-DMC, Doc 21; case no 324-po-00167-DMC, Doc 21; case no 3:24-po-00206-DMC, Doc 24; and case no 3:24-po-00121-DMC, Doc 30.

28   [3] This "footprint" is significantly larger than the actual area occupied by the Gathering, as will later be discussed.

1  from the location of my citations (Transcript, P 24 L 2-8). There is no reasonable expectation for

2  "the public" to walk about a mile through National Forest or upon National Forest Roads in order

3  to view a notice that the place they currently occupy has abruptly become subject to a closure

4  order.

5      The majority of the Gathering was in the woods away from the roads- while the images of

6  postings presented by the government shows wooden sandwich boards directly on a forest road,

7  *Mordchia* (Document 26-27, Exhibits 5-8). At the time of these postings ["on or about June" 26-

8  27, see *Mordchia* (Document 22, Declaration of H Markin)], "Estimated attendance" was 561, see

9  *Mordchia* (Document 21, Declaration of C Carlton), yet there are no visible participants, vehicles,

10 camps, or any other associated indicators that a growing gathering of 561 people is happening in

11 the picture of the nearest posting to the event[4]

12     These displays of the prohibitions in the Rainbow Closure were insufficient to bring it to

13 the attention of "the public" most directly affected by them (the 561 people already there) by any

14 reasonable measure. That fact is borne out by the disposition of the citation from July 5, 2024

15 where my "earlier entry" led to the "absence of being put on notice" (Transcript P 60 L 20-25).

16 By the government's own records, however- there are 561 people who shared my "unique

17 circumstances" *ibid.*

18     By the plain language of *36 CFR 261.50(b)*, the "additional steps" taken to "to ensure full

19 and adequate notice was provided" *see Mordchia* (Document 21, Declaration of C Carlton) are

20 irrelevant, as none of them entail "Displaying each prohibition imposed by an order in such place

21 and manner as to reasonably bring attention of the prohibition to the public." Moreover, the

22 folding board displays were portable and easily could have been placed in the areas the

23 participants in the Rainbow Gathering were actually occupying (Exhibit A/ included Declaration

24 of Defendant), including the "Main Meadow[5]" within the woods away from the road.

25     Furthermore, these "additional steps" fail to demonstrate that the enforcement of the

26 Rainbow Closure fulfilled the "spirit" of this regulation.

27 _____

[4] See *Mordchia* Doc 27 P 4 (Exhibit 8); and Doc 22 P 3 (# 17) stating location of posting
[5] This is a colloquialism used at Rainbow Gatherings to designate the place where a large communal meal called
28 "main circle" is held.

1    I will first acknowledge the facts stated in this declaration do strongly imply that

2    individuals entering the closed area were likely given adequate notice of the Rainbow Closure in

3    a reasonable manner. As paragraph 9(a) of Chris Carlton's declaration (*Mordchia, Doc 21*) states,

4    "numerous vehicles attempting to enter the Closure Area (were) contacted and turned around that

5    day and days following." Note that the vehicles "attempting to enter" had been "contacted"

6    directly, presumably by Forest Service personnel. In contrast, Paragraph 9(b)- we are asked to

7    infer that the crucial 561 people already within the closure were given adequately reasonable

8    notice because over the course of two days that number had dwindled to approximately 179

9    (*Mordchia, Doc 21*).

10    But this fact could have a myriad of explanations which are completely unrelated to

11    whether or not any of these individuals had received due notice of the Rainbow Closure.

12    Participants may have left because they were intimidated by earlier acts of vandalism and

13    sabotage directed at the Rainbow Gathering as part of a "full-on campaign" to shut down the

14    Rainbow Gathering (Transcript, P 44 L16 through P47 L1). Others may have left simply to get

15    supplies and come back, without learning of the Rainbow Closure until they used their phones in

16    town, or when they attempted re-entry. The majority of individuals could easily have chosen to

17    leave based on rumors and speculation, rather than any actual direct contact with Forest Service

18    personnel.

19    All we know about the specific procedures used to give notice of the Rainbow Closure to

20    the 561 already there is that the Incident Management Team was "directed" to "provide active

21    and continuous notification" *Mordchia* (Document 21) with no clarification as to what methods

22    were used to ensure the 561 people already there were properly informed of all the prohibitions

23    enacted through the Rainbow Closure. The only specific actions on the record which even hint at

24    efforts to "provide active and continuous notification" of the Rainbow Closure to the participants

25    are an "in person visit" on July 4, 2024 (Document 13, P2 L16-19), and the "statement of

26    probable cause" which serves as exhibit D in an ultimately successful motion to dismiss by *Zirk*

27    *(case no 3:24-po-00167-DMC, Doc 15-1, P11*, where it says two LEO's "dropped off (The

28    Rainbow Closure) to the Rainbow Gathering" on June 26, 2024. While it is unclear precisely

1  what "dropped off" means, it certainly isn't "active and continuous notification" *Mordchia,*

2  (Document 21). And it certainly isn't "robust efforts to provide sufficient notice of the Closure

3  Order to the unauthorized campers before undertaking even the mildest type of enforcement

4  action." as the government claims in their opposition to my Motion to Vacate (Document 54, L5-

5  6).

6     Given that it was not until almost a year after the Rainbow Closure that the government

7  produced any evidence of Forest Service compliance with 36 CFR 261.50(a), that the evidence

8  finally presented fails to prove compliance with 36 CFR 261.50(b), and that the evidence on the

9  record indicates the Forest Service did not comply with 36 CFR 261.50(b)- the court must find

10  that the Rainbow Closure was non-compliant, and therefore it was unlawfully issued. As such, I

11  cannot be held liable for violation of said order under 36 CFR 261.53(e) and my conviction must

12  be vacated, then overturned with prejudice.

13

14     **(2) The failure of the Forest Service to follow the mandated procedures in the**

15     **Law Enforcement Handbook when issuing the Rainbow Closure rendered**

16     **it unlawful.**

17

18     For the most part, in their rebuttal to this argument from my Motion to Vacate, the

19  government simply restates their portion of the argument based on *United States v. Fifty-Three*

20  *Eclectus Parrots, 685 F.2d 1131, 1136 (9th Cir. 1982)* summarized in my initial motion. Briefly,

21  their contention is that the relevant portions of the Law Enforcement Handbook are neither

22  "legislative in nature" because they are "internal documents" and that they were not "promulgated

23  pursuant to statutory authority and with procedural compliance (Document 54, P9, L 8-17, citing

24  *Fifty-Three Eclectus Parrots*)."

25     In particular, the government claims that because the Law Enforcement Manual was not

26  "issued through a notice-and-comment rulemaking process," nothing contained in it can have the

27  "force of law (Document 54, P9, L 19-20)."

28     But as the Court noted in *Louise J. Hamlet v. United States, 63 F.3d 1097 (Fed. Cir.*

1  *1995)*-

2  "regardless of whether a provision of an agency's personnel manual or

3  handbook was published or promulgated under the standards set out in the APA,

4  such provision is a regulation entitled to the force and effect of law if

5  "(1) the promulgating agency was vested with the authority to

6  create such a regulation;

7  "(2) the promulgating agency conformed to all procedural

8  requirements, if any, in promulgating the regulation;

9  "(3) the promulgating agency intended the provision to establish a

10  binding rule; and

11  "(4) the provision does not contravene a statute."

12  Let's first consider the authority of the Forest Service Directive System (Hereinafter

13  referred to as the "FSDS") through which the Forest Service Manuals are promulgated. As stated

14  in section 7 of the "Guide to Forest Service Directives" (Exhibit J in *Oswald, Document 19-1,*P 5-

15  63, hereinafter referred to as the "Forest Directives Guide"), "The basic authority for the Chief to

16  issue directives concerning Forest Service operations is Title 7, Code of Federal Regulations,

17  section 2.7 (*7 CFR 2.7*)." But beyond that "basic authority" lies a number of other Federal

18  Regulations-

19  "The Federal Property Management Regulations (*41 CFR 101-11.209;*

20  *FSH 6409.31 - FPMR 101-11.209*) set Government-wide standards and guidelines

21  for Federal agencies in establishing and managing effective directive systems. The

22  Federal Information Resources Management Regulations (*41 CFR 201-6.002(k)*)

23  require agencies to "control the creation and distribution of agency directives to

24  eliminate duplicative, conflicting, or confusing instructions to agency personnel,

25  and to ensure proper documentation of agency policies and procedures."

26  Clearly, the Forest Service was vested with the authority to maintain its standards through

27  the FSDS, which includes Forest Service Handbooks and Manuals.

28  Now we'll turn to whether "(2) the promulgating agency conformed to all procedural

1     requirements, if any, in promulgating the regulation" *Hamlet*. The initial pages of the Law

2     Enforcement Handbook provide ample documentation of conformity to procedural requirements,

3     including an exhaustive list of changes from the previous handbook (*Oswald, Doc 19-1,* P 19-21)

4     and a record of who approved the amendments and when (*Ibid,* P 19). Now we'll briefly skip to

5     the last stipulation in *Hamlet* requiring "(4) the provision does not contravene a statute" and note

6     that it is self-evident this one is fulfilled.

7         That leaves the third stipulation, which requires that "(3) the promulgating agency

8     intended the provision to establish a binding rule." *Hamlet* offers further guidance in ascertaining

9     what was intended-

10                 "the court should consider (a) whether the language of the provision is

11                 mandatory or advisory; (b) whether the provision is 'substantive' or 'interpretive';

12                 (c) the context in which the provision was promulgated; and (d) any other extrinsic

13                 evidence of intent."

14         Examining the language used in the Law Enforcement Handbook, Section 32.21, titled

15     "Order Case Files," we have-

16                 "An order case file must be maintained for each proposed or issued order.

17                 The case file should contain an Assessment of Need and Enforcement Plan (sec.

18                 32.4, ex. 01), appropriate National Environmental Policy Act (NEPA) and Civil

19                 Rights Impact Analysis (CRIA) documentation and order checklist.... The records

20                 custodian is responsible for... providing certified authentic copies of orders and

21                 relevant case file documents for court or litigation purposes.... The order case file

22                 must be retained in open agency files until the order is terminated, all civil and

23                 criminal cases related to the order are resolved, and all appeal periods have

24                 expired." (Emphasis added).

25         In Section 32.24, titled "Civil Rights Impact Analysis"-

26                 "A Civil Rights Impact Analysis (CRIA) must be completed when required

27                 per FSM 1730 and FSH 1709.11. Responsible Forest Service officers shall

28                 examine proposed policy actions for civil rights implications (FSM 1730.3).

1   When referring to FSH 1709.11 (Exhibit B, Hereinafter referred to as the "Civil Rights
2   Handbook"), we find the following guidance in Section 31.1, titled "Actions requiring and impact
3   analysis."-

4           "FSM 1730 specifies that responsible Forest Service officers shall examine
5           proposed major policy actions for civil rights implications. Two possible courses
6           of action are available to the responsible official (FSM 1704.2).

7                   "1. Prepare a civil rights impact statement for any major policy that
8                   has a significant civil rights impact.

9                   "2. Document the decision that a civil rights impact statement is
10                  not required.

11          "When determining what constitutes a "major action," decide whether the
12          proposed action appears as if it would affect 10 or more persons or entities either
13          inside or outside the Forest Service. If this is the case, then the responsible official
14          must prepare a civil rights impact statement." (Emphasis added)

15      In *Rank v. Nimmo, F.2d 692, 698 (9th Cir. 1982)*- one of the cases cited by the
16  government in their response- it was held that the "Lenders' Handbook, VA Pamphlet No. 26-7
17  (Revised)" (Hereinafter referred to as the "Lender's Handbook") did not have the "force of law".
18  For comparison of language, it begins with an introductory note stating-

19          "(The Handbook is) designed to guide lenders in the processing of
20          applications for loans ... and in the treatment of defaults and claims arising through
21          loans made. Nothing contained here shall be construed to modify or otherwise alter
22          any provisions of the regulations." *Nimmo,* (citing the Lender's Handbook)
23          (emphasis added)

24      The contrast in language is undeniable.

25      Because the language of the Law Enforcement Handbook is mandatory and not advisory,
26  which is why, unlike the Lender's Handbook- its provisions do have the force of law.

27      Furthermore, the provisions requiring that a CRIA and an ANEP be created when issuing
28  a Forest Closure are clearly substantive, not interpretive. The Law Enforcement Manual provides

1   clear examples and standards for the creation of these documents *see Oswald, Doc 17-1* (P 31-

2   32). The mandate that a "case file" by maintained which includes these documents specifically

3   requires them to be produced when needed for litigation. Such procedures clearly exist for the

4   preservation of our original rights, as without them- it would be all too easy for discretion to be

5   abused.

6        Turning to the "context in which the provision was promulgated" *Hamlet,* we find that

7   context is the FSDS, and according to the Forest Directives Guide-

8               "The Directive System architecture and the full integration of directives

9               issuance with other administrative systems have long made the Forest Service

10              Directive System a model within the Federal Government. *See Oswald, doc 19-2,*

11              (P 10-11)"

12        The Forest Directives Guide meticulously documents their authority and purpose, citing

13   two Federal regulations (*41 CFR 101-11.209, FPMR 101-11.209*) and a Forest Service Handbook

14   (*FSH 6409.3*), which, taken together, "set Government-wide standards and guidelines for Federal

15   agencies in establishing and managing effective directive systems *See Oswald, doc 17-2* (P 11)."

16   The Forest Directive Guide points to an additional regulation [*41 CFR 201-6.002(k)*], which-

17              "require agencies to 'control the creation and distribution of agency

18              directives to eliminate duplicative, conflicting, or confusing instructions to agency

19              personnel, and to ensure proper documentation of agency policies and procedures.'

20              (citing regulation) *Ibid.*" (Emphasis added)

21        To ensure it is clear which provisions are mandatory and which interpretive- the Forest

22   Directives Guide offers precise guidance-

23              *"The words used to issue direction, not whether the direction is located in*

24              *the manual or handbook component of the Directive System, determine how*

25              *binding the direction is on Forest Service employees.* The use of the helping verbs

26              "must" and "shall" or imperative mood (where the subject "you" is understood)

27              convey mandatory compliance; "ought" and "should" convey required compliance,

28              except for justifiable reasons; and "may" and "can" convey optional compliance.

1          *Ibid* (P 9)." (emphasis in original)

2          The above-mentioned "helping verbs" have already been pointed out throughout the

3  relevant provisions.

4          And the clarification that the "imperative mood" also coveys "mandatory compliance,"

5  indicates that the provision in Section 32.25, titled "Assessment of Need and Enforcement Plan,"

6  of the Law Enforcement Handbook which issues the command-

7                    "Ensure an Assessment of Need and Enforcement Plan is completed and

8                    approved containing these actions. *See Oswald, Doc 17-2* (P 35)"

9          -is "mandatory" and not merely "required."

10         Finally, there is "extrinsic evidence, *see Hamlet*" to consider. A cursory search on the

11  internet shows that such documents appear to have been created for other Forest Closures

12  (Exhibit C). But whether it is because they are restricted or because the web archive is poorly

13  maintained, I am unable to directly view them (Exhibit C). Taking all the appropriate factors into

14  consideration, it is hard to imagine it could be any more clear the intent of these provisions was

15  that they be binding.

16         To conclude-

17         The relevant provisions in the Law Enforcement Handbook "mandate" that a CRIA and an

18  ANEP be prepared during the issuance of a Forest Closure.

19         They were promulgated through the Forest Service, which is vested with the authority to

20  do so. They were promulgated in accordance with the appropriate Forest Service and Regulatory

21  procedures. Their intent was inarguably to be binding. And they contravene no statutes.

22         So in accordance with *Hamlet's* clarification of *Fifty-Three Eclectus Parrots*, this court

23  must find that these provisions have the force of law, "regardless of whether (the provisions were)

24  published or promulgated under the standards set out in the APA" *Hamlet*.

25         Therefore, by failing to be issued in compliance with these provisions, the Rainbow

26  Closure Order was unlawful and I cannot be held liable for violation of it.

27         Therefore, my conviction must be vacated and overturned.

28

1
2
3

**(3) By failing to inform my counsel that no ANEP or CRIA had been created**
**during the issuance or enforcement of the Rainbow Closure, the**
**government violated its *Brady* obligations.**

4

5    The government once again appears to not have correctly understood my original motion,
6    claiming my Motion to Vacate merely- "repeats several discovery-related arguments he made in
7    his other motions (and addressed above)" (Document 54, P 8, L 22-23).

8    The original motion to reconsider discovery sought inspection of an ANEP and a CRIA
9    because they had clear relevance to my defense. But by denying my counsel's initial discovery
10   request and opposing the turning over of those items when arguing against the pre-trial motion to
11   compel discovery (Document 11)- rather than arguing the government can't turn them over
12   because they don't exist- the government represented false information to my counsel and the
13   court, specifically that such documents had been created.

14   The distinction is subtle, but important. In the original motion, the issue was about
15   documents "material to preparing the defense" *Fed R Crim P 16(a)(1)(E)(i)* being suppressed
16   directly. But the later motion is about the fact that these materials were never prepared, a fact
17   which was suppressed through the government representing that it had a reason other than non-
18   existence for denying their discovery.

19   The situation is analogous to *Bihun v. AT&T Information Systems, Inc., 13 Cal. App. 4th*
20   *976; 16 Cal. Rptr. 2d 787; 1993 Cal. App.* in which an employee suing for sexual harassment
21   sought the production of another employee's personnel file. The defense denied this request and
22   opposed a motion to compel production of it- then at trial, it was revealed that the file had been
23   lost or destroyed. As a result, the Jury was instructed that if they found that the personnel file had
24   been "willfully suppressed," then they could "draw an inference that there was something
25   damaging to defendant's case contained in that personnel file" *Ibid*. These Jury instructions were
26   challenged on appeal and the Court up-held them, finding that-

27          "Rather than tell the truth, that the file had been lost or destroyed, he
28          asserted, without any factual basis, that the file contained nothing relevant to this

1    action and production of the file would violate Fellows's right of privacy." *Ibid.*

2    There is a direct correlation between those facts and the facts of my case, where rather

3    than tell the truth- that the Forest Service had never created an ANEP or a CRIA- the government

4    insisted they were "internal agency files" that were not considered part of "conventional

5    discovery" (Document 54, L 15-16).

6    Furthermore, the record in the cases of similarly situated defendants indicates that these

7    non-existent documents were not the only ones "material to preparing the defense" against the

8    Rainbow Closure Order. Take the "Talking Points for implementing Indian Creek Headwaters

9    Road and Area Closure on Plumas National Forest" *Oswald,* (Document 18-1, P 13, "Exhibit

10   E."), for example. This clearly falls under the purview of "(8) Any and all correspondence

11   between USFS and other law enforcement officials regarding Rainbow Gatherings in California"

12   (Document 11, P 8, L 17-18) as was requested by my counsel. It seems contradictory to claim a

13   document used in the opposition to a dismissal motion by a similarly situated defendant is

14   somehow not "material" to my challenge to the Rainbow Closure Order.

15   Within the exhibits in *Mordchia* are actual images of the Rainbow Closure postings

16   (*Mordchia*, Document 26 &27, Exhibits 5-8), something which my counsel questioned Officer

17   Luke Dalton about on cross-examination (Transcript, P 23, L 21 thru P 24, L 1). Had those

18   images been turned over to my counsel, they could have been directly referred to, making cross

19   examination along those lines significantly more compelling- much the way I referred to those

20   documents earlier in this very motion. Similarly, the map which purported to show the "footprint"

21   of the Rainbow Gathering which the government presents in *Mordchia* (Document 26, p 2)

22   greatly exaggerates the geographical size of the Rainbow Gathering (Exhibit A/ included

23   Declaration of Defendant). Had I been able to inspect it prior to my trial, that exaggeration could

24   be used to demonstrate a prejudicial attitude towards the event.

25   *Kyles v. Whitley, 514 U.S. 419 (1995)* establishes four aspects of materiality.

26   1) "The question is not whether the defendant would more likely than not

27   have received a different verdict with the evidence, but whether in its absence he

28   received a fair trial, understood as a trial resulting in a verdict worthy of

1          confidence. A 'reasonable probability' of a different result is accordingly shown

2          when the government's evidentiary suppression 'undermines confidence in the

3          outcome of the trial.' (citing *Bagley, 473 U. S., at 678*)" *Ibid.*

4               2) "One does not show a *Brady* violation by demonstrating that some of the

5          inculpatory evidence should have been excluded, but by showing that the

6          favorable evidence could reasonably be taken to put the whole case in such a

7          different light as to undermine confidence in the verdict." *Ibid.*

8               3) "once a reviewing court applying *Bagley* has found constitutional error

9          there is no need for further harmless-error review." *Ibid.*

10              4) "The fourth and final aspect of *Bagley* materiality to be stressed here is

11         its definition in terms of suppressed evidence considered collectively, not item by

12         item." *Ibid.*

13         And while even taken alone, the fact that the government not only suppressed but

14   misrepresented the failure of the Forest Service to create and include an ANEP or a CRIA when

15   issuing the Rainbow Closure Order "undermines confidence int the outcome of the trial" *Ibid.*

16   Especially, given that there are five defendants in *Oswald, et al* who did not suffer under this

17   misrepresentation, and were successful in having their closure charges dismissed with prejudice.

18         The revelation that the sum total of the Forest Service's documented justification for the

19   Rainbow Closure is a memo that happens to cite concerns of one of the individuals displaying the

20   most openly hostile to the Rainbow Gathering (see Appellant Brief filed with this motion) is

21   certainly something that "could reasonably be taken to put the whole case in such a different light

22   as to undermine confidence in the verdict" *Whitley*.

23         And when considered collectively with the materials later presented by the government in

24   defense of the Rainbow Closure it becomes indisputable that the obligations of *Brady* were not

25   met, even more so when it is also taken into account that-

26              "... the prosecution, which alone can know what is undisclosed, must be

27         assigned the consequent responsibility to gauge the likely net effect of all such

28         evidence and make disclosure when the point of "reasonable probability" is

1           reached. This in turn means that the individual prosecutor has a duty to learn of

2           any favorable evidence known to the others acting on the government's behalf in

3           the case, including the police. But whether the prosecutor succeeds or fails in

4           meeting this obligation (whether, that is, a failure to disclose is in good faith or bad

5           faith, see *Brady, 373 U. S., at 87*), the prosecution's responsibility for failing to

6           disclose known, favorable evidence rising to a material level of importance is

7           inescapable" *Ibid.*

8       The government's misrepresentations about the existence of an ANEP or a CRIA alone is

9 sufficient to make the determination that *Brady* was violated inescapable. When taken

10 collectively with the undisclosed materials which have since been put on the record by the

11 government, it becomes overwhelming.

12

13 **IV-    CONCLUSION**

14

15       The judgement is obvious and undeniable.

16       My conviction must be vacated and overturned because the Rainbow Closure was issued

17 unlawfully in violation of 36 CFR 261.50(b), as well as the procedures of the Law Enforcement

18 Handbook which carry the force of law.

19       And failing that, I must be granted a new trial as my right to a fair trial was denied

20 through the government's misrepresentation that an ANEP and a CRIA had been created for the

21 Rainbow Closure Order by the Forest Service, as well as their failure to disclose materials later

22 used to defend it.

23       And I move that the court Order it so.

24

25                              Respectfully submitted,

26       Paul Kingston,

27       x _PAUL KINGSTON_

28       Date: August 21, 2025

# EXHIBIT A



# EXHIBIT B

**FSH 1709.11 - CIVIL RIGHTS HANDBOOK**
**CHAPTER 30 - CIVIL RIGHTS IMPACT ANALYSIS**

## Table of Contents

30 - CIVIL RIGHTS IMPACT ANALYSIS..............................................................................3
   30.5 - Definitions .................................................................................................................3
   30.6 - Basis for Civil Rights Impact Analysis ......................................................................5
31 - OVERVIEW OF CIVIL RIGHTS IMPACT ANALYSIS .....................................6
   31.1 - Actions Requiring Impact Analyses ..........................................................................6
      31.11 - Environmental Actions. ......................................................................................9
      31.12 - Administrative Actions. ......................................................................................9
   31.2 - Getting Started. ..........................................................................................................9
   31.3 - Generalized Process for Impact Analysis. ...............................................................11
32 - DESCRIBE PROPOSED ACTION ........................................................................11
33 - COLLECT AND INTERPRET RELEVANT DATA .........................................11
   33.1 - Selection of Variables...............................................................................................12
      33.11 - Need for Measurable Variables ........................................................................12
      33.12 - Categories of Variables.....................................................................................12
      33.13 - Applying Selection Criteria ..............................................................................14
   33.2 - Types of Civil Rights Data .......................................................................................15
      33.21 - Statistics............................................................................................................15
      33.22 - Written Materials ..............................................................................................15
      33.23 - Observations .....................................................................................................15
      33.24 - Respondent Contacts ........................................................................................16
   33.3 - Compiling and Verifying Data .................................................................................19
   33.4 - Interpreting Data.......................................................................................................19
      33.41 - Minimizing Bias ...............................................................................................20
      33.42 - Interest Groups .................................................................................................20
      33.43 - Time Frames .....................................................................................................21
   33.5 - Data Organization.....................................................................................................21
      33.51 - Use of Graphics ................................................................................................21
      33.52 - Documenting the Analysis................................................................................22
34 - FORMULATE ALTERNATIVES .........................................................................22
   34.1 - No-Action Alternative ..............................................................................................22
   34.2 - Action Alternative ....................................................................................................22
35 - ESTIMATE EFFECTS OF ALTERNATIVES ...................................................23
   35.1 - Agency-Induced Changes.........................................................................................23
   35.2 - Other Sources of Changes ........................................................................................24
   35.3 - Sociocultural Effects ................................................................................................24
   35.4 - Direct, Indirect, and Cumulative Effects.................................................................25
   35.5 - Effective Description of Effects ...............................................................................25
36 - EVALUATE ALTERNATIVES .............................................................................25
   36.1 - Civil Rights Criteria for Evaluating Alternatives....................................................26
   36.2 - Determining Significance.........................................................................................27
   36.3 - Comparison of Alternatives......................................................................................27
   36.4 - Identification of the Preferred Alternative ..............................................................27

**FSH 1709.11 - CIVIL RIGHTS HANDBOOK**
**CHAPTER 30 - CIVIL RIGHTS IMPACT ANALYSIS**

**37 - DOCUMENT THE ANALYSIS AND MONITOR THE ACTION ..................................... 27**
    37.1 - Implementation ......................................................................................................... 27
    37.2 - Monitoring .............................................................................................................. 27
**38 - TECHNIQUES, PROCEDURES, AND EXAMPLES ..................................... 28**
    38.1 - Data Sources ......................................................................................................... 28
    38.2 - Projections ............................................................................................................ 29
    38.3 - Examples Relating to Civil Rights Impact Analysis ............................................................. 31
    38.4 - References ............................................................................................................ 47

## 30 - CIVIL RIGHTS IMPACT ANALYSIS

This chapter explains the need for civil rights information in Forest Service administrative planning and decision making and describes basic principles and techniques for conducting civil rights impact analyses. The chapter provides procedures for implementing FSM 1730.

The intended users of this chapter are Forest Service managers, Civil Rights Directors or Coordinators, Equal Employment Opportunity specialists, and other analysts involved in the impact analysis process. The line officers and staff of each Forest Service unit (section 30.5) must be aware of the civil rights contexts of Forest Service actions and of the variety of effects that could result from those actions. Civil rights analysts must be proficient in compiling and interpreting civil rights information relevant to management decisions. Informed estimates of the potential civil rights consequences of proposed actions enable managers to consider public, employee, and Forest Service needs and concerns when making decisions.

### 30.5 - Definitions

This chapter uses the following concepts:

1. <u>Area of Influence</u>. An area of influence is a delineated geographic area that includes the population most affected by the past, present, or proposed actions of a Forest Service unit. The area may be local to international scale, depending on circumstances. An area of influence used in estimating civil rights effects of an action is also known as an impact analysis area.

2. <u>Category, Social</u>. A social category consists of people with a common social characteristic, such as age, nationality, occupation, hobby, interest, or educational level.

3. <u>Community</u>. A community consists of people who reside in and identify with a specific locality, interact socially, and cooperate to meet common needs.

4. <u>Community Cohesion</u>. Community cohesion is the degree of unity and cooperation evident in a community as it defines problems and attempts to resolve them.

5. <u>Community Stability</u>. Community stability results when the type and rate of change is consistent with a community's capacity to meet its needs without significant hardships to component groups or institutions.

6. <u>Comparison Unit</u>. A unit whose experiences with actions similar to those presently proposed for another unit may be helpful in predicting and mitigating possible effects.

7. <u>Culture</u>. Culture is the total way of life in a society that is transmitted from one generation to another. Culture includes language, customs, norms, values, beliefs, institutions, and technology.

8. <u>Demography</u>. Demography is the scientific study of population characteristics.

**FSH 1709.11 - CIVIL RIGHTS HANDBOOK**
**CHAPTER 30 - CIVIL RIGHTS IMPACT ANALYSIS**

9. Environmental Analysis. (FSH 1909.15, section 05).

10. Forest Service Unit. A unit is any Forest Service administrative level with the responsibility to conduct a civil right impact analysis; for example, a Forest, District, Region, or unit involved in State and Private or Research programs.

11. Group, Social. A social group consists of people who cooperate to pursue common interests or attain mutual goals.

12. Impact, Civil Rights. Impacts are alterations in people's civil rights status that occur in conjunction with a new policy, program, or project; are not attributable to any external factors; and are perceived by those affected as socially significant.

13. Impact, Social (also social effect). (FSM 1905).

14. Infrastructure. Infrastructure is a set of basic public and commercial facilities and support services, such as those of a community or county. Common elements include schools, stores, streets, housing, parks, telephones, water service, police and fire protection, hospitals, and social services.

15. Institution. An institution is a significant organizational structure and set of practices in a culture; for example, family, economy, government, education, and organized religion.

16. Institutional analysis. This type of analysis involves an examination of the institutions within the area of influence and their expected responses to Forest Service actions.

17. Interdisciplinary team. This team consists of persons who use an interdisciplinary approach to ensure the integrated use of the natural and social sciences and environmental design arts in planning and decision making, as required by the National Environmental Policy Act (40 CFR 1502.6; FSH 1909.15, section 11.7).

18. Lifestyle. (FSH 1909.17, section 051).

19. Linkage. An observable relationship between Forest Service activities and Forest users or other publics.

20. Minority. Persons deprived of equal social and economic opportunities because of their racial or ethnic background (FSM 1705).

21. Mitigation. Mitigation involves making the impact of an action less severe. (40 CFR 1508.20).

22. National Environmental Policy Act (NEPA) Process. (40 CFR 1508.21).

23. Norms. Norms are group-held standards for behavior, such as good manners, customs, morals, regulations, and laws.

**FSH 1709.11 - CIVIL RIGHTS HANDBOOK**
**CHAPTER 30 - CIVIL RIGHTS IMPACT ANALYSIS**

24. Public Participation. Communication between forest users or other interested people and the Forest Service is public participation. Another term for public participation is public involvement.

25. Site-Specific. This is an action such as a timber harvest, administrative decision, road, or water project that involves a limited, often well-defined geographic area.

26. Social analysis. Social analysis involves collecting and evaluating information about the social context and social effects of Forest Service activities.

27. Social Impact Analysis. This is the social component of the environmental analysis process using social science information and methodology to determine how present programs or proposed actions affect human populations.

28. Social Organization. The structure of a society described in terms of roles, relationships, norms, institutions, infrastructure, and/or community cohesiveness and stability is its social organization.

29. Subculture. A subculture forms when a portion of the population shares a distinctive pattern of beliefs, values, norms, and customs, often because of a common age, ethnic heritage, occupation, or religious or ideological orientation.

30. Value, Social. A social value is a shared standard of preference or desirability, such as natural beauty, good health, honesty, career success, privacy, and the desire to develop natural resources.

31. Variable. A variable is a trait or characteristic that can vary in value or magnitude from case to case.

## 30.6 - Basis for Civil Rights Impact Analysis

All Forest Service actions have some form of impact, both positive and negative. The purpose of the impact analysis is to determine the scope, intensity, duration, and direction of impacts resulting from a proposed action. The range of actions having potential impacts is great--from minor decisions about a resource use to organizational restructuring throughout the Forest Service. The intention of conducting an impact analysis is to consider such actions in the light of evaluative findings about the situation, including such alternatives as may be pointed up, mitigation measures to reduce negative impacts, necessary documentation to support the analysis, and procedures to monitor the implementation of the action. Analyze any organizational changes (policies, procedures, or other such actions) for potential impacts on the public, the Forest Service's delivery of goods or services, Forest Service employees, Forest Service organizational dynamics, and the interaction among all of these elements. The "ripple effect" of even seemingly small actions, taken over time, may set the stage for upheaval in any or all of the above sectors. In the interest of service to the public, analyze Forest Service actions for their civil rights impacts.

**FSH 1709.11 - CIVIL RIGHTS HANDBOOK
CHAPTER 30 - CIVIL RIGHTS IMPACT ANALYSIS**

## 31 - OVERVIEW OF CIVIL RIGHTS IMPACT ANALYSIS

There are two minor procedural differences between a civil rights impact analysis and any other type of impact analysis. The first difference is in subject matter. The second relates to the first in that the area of civil rights, particularly as it applies to the Forest Service, is quite complex with many variations from program to program. Civil rights concerns in the Forest Service have threads running throughout the many missions of the Agency. This fact is the one major difficulty in trying to define what must be included in a civil rights impact analysis. Certainly, affirmative action and equal employment opportunity are principal touchstones for the civil rights program and can be fairly well delineated for the purpose of impact assessment. More difficult are the ancillary areas, for example:

1. Access for the handicapped (Engineering).

2. Contracting and Procurement (Finance and Accounting).

3. Assistance to minority landowners (State and Private Forestry).

4. Cooperative Education Programs (Personnel).

5. Employee Housing (Several Functional Areas).

6. Minority Recreation Opportunities (Recreation).

### 31.1 - Actions Requiring Impact Analyses

FSM 1730 specifies that responsible Forest Service officers shall examine proposed major policy actions for civil rights implications. Two possible courses of action are available to the responsible official (FSM 1704.2).

1. Prepare a civil rights impact statement for any major policy that has a significant civil rights impact.

2. Document the decision that a civil rights impact statement is not required.

When determining what constitutes a "major action," decide whether the proposed action appears as if it would affect 10 or more persons or entities either inside or outside the Forest Service. If this is the case, then the responsible official must prepare a civil rights impact statement. FSM 1731 specifies six actions for which the preparation of a civil rights impact statement (CRIS) is required. These actions, along with a summary of procedures for CRIS's are in 31.1, exhibit 01. As can be seen in the table, civil rights impact analyses (CRIA) fall into two main categories: environmental and administrative.

**FSH 1709.11 - CIVIL RIGHTS HANDBOOK
CHAPTER 30 - CIVIL RIGHTS IMPACT ANALYSIS**

31.1, Exhibit 01

| Procedures for Writing Civil Rights Impact Statements | | | | |
|---|---|---|---|---|
| IF | AND | THEN | FORMAT | ADDITIONAL COMMENTS |
| 1. Actions requiring environmental impact. | Chief and/or responsible official determines there is a major civil rights impact | PREPARE | FSM 1950 | Not a separate report.  Part of the social and economic sections of the environmental impact statement. |
| 2. Rules, regulations, and policies published in the Federal Register. | Same as item 1 | CIVIL | | Submit to the Office of Equal Opportunity (OEO) of the Department simultaneously with the Federal Register submission.  Not necessary to reference the statement in the Federal Register. |
| 3. Changes in existing or new personnel management rules, regulations, or policies in the Forest Service. | Same as for item 1 | RIGHTS | | |
| 4. Forest Service decisions not published in the Federal Register. | Same as for item 1 | IMPACT | | Submit to OEO of the Department while major policy decision is in draft. |
| 5. Location or relocation of field installations. | Same as for item 1 | STATEMENT | FSM 1240 | PREPARED ONLY IF ACTION AFFECTS 10 OR MORE EMPLOYEES.  Submit as part of the facilities location/relocation request.  Include analysis of proposed location in terms of equal access to conveniently located, reasonably priced, nondiscriminatory housing for employees. |
| 6. Revisions of the Forest Service directives system. | Same as for item 1 | FOR ALL EXCEPT ITEM 2 | | |

**FSH 1709.11 - CIVIL RIGHTS HANDBOOK**
**CHAPTER 30 - CIVIL RIGHTS IMPACT ANALYSIS**

## 31.11 - Environmental Actions.

A civil rights impact analysis for environmental or natural resource actions is part of the social impact analysis package in a necessary environmental impact statement (EIS). For this category of Forest Service actions, civil rights impact statements are not separate reports, but instead are integral with the procedures and variables for the social impact analysis (SIA). The Forest Service Economic and Social Analysis Handbook, FSH 1909.17 (chapter 30) outlines the process for including civil rights in the SIA. Civil rights is one of the six major categories of variables which must be considered in any social analysis. Regional Civil Rights staffs should be familiar with the FSH 1909.17 and procedures so that they can provide assistance to planning staffs in the area of civil rights. This knowledge is also needed during the review phases of draft EIS's.

## 31.12 - Administrative Actions.

Administrative actions requiring civil rights impact analyses are in FSM 1730 and section 31.1, exhibit 01. The remainder of this chapter gives the procedures for preparing the civil rights impact statements. The form that a CRIS takes depends largely upon what type of action is being proposed. The level and specificity of detail vary--some actions require a minimal type of analysis, while other actions require a thorough, detailed analysis.

## 31.2 - Getting Started.

When performing a civil rights impact analysis, give proper consideration to the civil rights implications of all policy actions, procedures, regulations, and so forth. Civil rights specialists should initiate a goal to establish good impact contacts with employees who are in positions to be knowledgeable about actual or potential civil rights effects. Inform these individuals of the civil rights specialist's desire to keep abreast of possible positive or negative civil rights implications, and after making such a request, good contacts continue to provide responsive information. Upon receiving impact information, it is up to the civil rights specialist to make an assessment and decide whether a written civil rights impact statement is necessary. Examples of good contacts are in section 31.2, exhibit 01.

# EXHIBIT C



Forest Closure Assessment of Need and Enforcement Plan $\quad$ Q

Q All $\quad$ Images $\quad$ Videos $\quad$ News $\quad$ More ▾ $\qquad$ ⊕ Duck.ai $\quad$ ⚙

✓ Always protected ▾ $\quad$ All regions ▾ $\quad$ Safe search: moderate ▾ $\quad$ Any time ▾

 US Forest Service $\qquad$ ...
https //www.fs usda gov › Internet › FSE_DOCUMENTS · fseprd952079.pdf

**PDF Order Number 2021-D4-027 Assessment of Need and Enforcement Plan 1 ...** ✓

3. **Enforcement** **Enforcement of** the **closure forest** order will be a combination of signing, public information, personal contacts and law **enforcement** actions. The following summarizes the **enforcement** goals with respect to this **closure** order. The goal will be to ensure that people are...

An official website of the United States government  Here's how you know ⌄



**USDA** **Forest Service**
Caring For the Land and Serving People

Forest Service Home    About the Agency    Contact the National Office    Inside the FS

Forest Service National Website

# Page Not Found

Sorry, the content you are looking for is not found or has moved. Please use the back button or select the site you would like to visit.

**Select a Site**

⌄

**Go To Site**